UNITED STATES of America,
Plaintiff-Appellant,

v.

Pedro MORENO and Rolando Cue-Bae-
za, Defendants-Appellees.

No. 84–5671.

United States Court of Appeals,
Eleventh Circuit.

Dec. 19, 1985.

Stanley Marcus, Linda Collins Hertz, U.S. Attys., James G. McAdams, III, Asst.

U.S. Atty., Miami, Fla., for plaintiff-appellant.

Michael Osman, Miami, Fla., for Cue-Baeza.

George Cardet, Miami, Fla., for Moreno.

Before HILL and ANDERSON, Circuit Judges, and GARZA*, Senior Circuit Judge.

HILL, Circuit Judge:

This appeal arises from the search and seizure by United States Customs officials of the vessel ESTURION and the subsequent arrest of its crew, appellees Pedro Moreno and Rolando Cue-Baeza. Appellees sought to prevent the introduction at trial of evidence obtained as a result of that search, charging the search violated their fourth amendment rights. The district court held the evidence inadmissible. Appellant United States Government appeals the district court's ruling, contending the Customs officials' conduct constituted a valid border search and thus evidence procured as a result of the search was properly obtained.

### FACTS

We begin our analysis with an examination of the events leading up to the search at issue. At approximately 3:00 p.m. on February 24, 1984, United States Customs Patrol Officer Michael Deely observed the ESTURION as it passed the United States Customs office located on the banks of the Miami River near the Brickell Avenue Bridge. Agent Deely recognized the ESTURION as a vessel on Customs' lookout list of vessels suspected of being involved in narcotics smuggling. Deely, along with other Customs officials, proceeded to the customshouse dock where they displayed

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

their identification and hailed the vessel over to the dock.[1]

Upon boarding the vessel, Customs agents discovered two men, later identified as appellees Moreno and Cue-Baeza. In answer to agent's questions, Moreno stated that he was the vessel's captain and presented the ship's documents for inspection. Moreno informed the officers that he and Cue-Baeza were on a return trip from Nassau, Bahamas by way of the Florida Keys, and had made no landfall nor cleared customs prior to arriving at their present location on the Miami River.

Once it was apparent that the ESTURION had entered the United States from foreign waters, the agents began conducting what they considered a border search of the vessel. Noting that the ESTURION's fuel tanks were exceptionally large for a vessel its size, the officials drilled a small hole into the port fuel tank but discovered that the tank was in fact filled with diesel fuel. At this time Customs Patrol Officer Walter Herm arrived at the scene and related to the other agents that from a previous boarding of the ESTURION he knew the vessel contained concealed compartments. Agents then drilled a second hole into another portion of the fuel tanks. A probe inserted into this second hole indicated that bulk objects, rather than liquid fuel, occupied the tank. Officials then used an electric saw to gain access to the concealed compartments and upon doing so discovered numerous bales of marijuana.

## ARGUMENT

■ "It is well established that border searches are not subject to constitutional probable cause and warrant requirements." *United States v. McMurray*, 747 F.2d 1417, 1419–20 (11th Cir.1984). "The fact that one is in the process of crossing an international boundary provides sufficient reason in itself to permit a search for aliens or contraband, without the presence of any other circumstance that would normally have to attend the requirements of the Fourth Amendment." *United States v. McDaniel*, 463 F.2d 129, 132 (5th Cir.1972), *cert. denied*, 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973). Further, a search may constitute a border search even though it does not technically occur at the border. A border search may be conducted at any location considered the "functional equivalent of the border," including the point where a ship first docks in this country after entering our territorial waters from abroad. *United States v. Prince*, 491 F.2d 655, 658–59 (5th Cir.1974).

■ Pursuant to this authority, it is clear that the search of the ESTURION invoked no fourth amendment violations. When hailed by Customs officials, the ESTURION and her crew had neither touched land nor cleared customs since reentering United States waters. The customshouse dock, as the initial point of landfall, thus constituted the functional equivalent of the border, authorizing a border search of the vessel. *United States v. Stone*, 659 F.2d 569, 572 (5th Cir. Unit B 1981).[2] Further, Customs officials had ample reason to take a particular interest in this vessel as it was included on a list of vessels suspected of bringing into this country articles not declared to or inspected by Customs. Regarding the extent of the search, it is well settled that baggage, vehicles, or vessels entering this country may be subjected to searches sufficient to disclose their contents. *Henderson v. United States*, 390 F.2d 805, 808 (5th Cir.1967). In this action the extent of the search was particularly justified since one of the attendant Customs agents remembered from a previous boarding that the ESTURION contained secret compartments. *See United States v. Sarda-Villa*, 760 F.2d 1232 (11th Cir. 1985).

---

**1.** Testimony indicated that at the time Officer Deely hailed the vessel he stated he was going to search the vessel regardless of the circumstances.

**2.** Decisions rendered after October 1, 1981, by a former Fifth Circuit Unit B panel are binding on this court. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

■ Finally, appellees' allegations that Deely's predetermination to search the ESTURION, before he knew that an actual border crossing had taken place, constitutes a fourth amendment violation misconstrues proper application of the border search exception to the present case. Regardless of Agent Deely's underlying motive, he acted within his authority when he boarded the vessel and conducted a documentation and safety check. *United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). "[T]he lawfulness of the boarding of a vessel is not vitiated by the fact that the officer ... had mixed purposes, both to make a document and safety check and to search for contraband...." *United States v. Albano*, 722 F.2d 690, 695 (11th Cir.1984) (quoting *United States v. Kent*, 691 F.2d 1376, 1383 (11th Cir.1982), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). Once aboard, conversation with Moreno indicated that the ESTURION had recently reentered United States territorial waters from a foreign destination and thus a border search at the border or its functional equivalent was appropriate. *United States v. Flynn*, 664 F.2d 1296, 1306 (5th Cir.),[3] *cert. denied*, 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982). As the customshouse dock clearly acted here as the "functional equivalent of the border," the agents' conduct fell within the scope of the border search exception and constituted a permissible search.

The decision of the district court granting the appellees' motion to dismiss is

REVERSED.

---

**3.** Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.